IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 04-45079 |
| **Bernard Box and Patsy Box,** | § | (Chapter 13) |
| Debtors. | § | |

## MEMORANDUM OPINION

The Court denies First State Bank's Motion for Relief from Stay. Because a lender may not require the proceeds of a Texas home equity loan to be applied to that lender's pre-existing, unsecured debt, the Court concludes that First State Bank's lien on the Debtors' homestead is unenforceable.

### Findings of Fact[1]

The following findings of fact are based on the testimony of Bernard Box and Kenneth Swick and the exhibits offered at the hearing on this matter. Mr. Box has been a First State Bank ("FSB") customer for over 15 years. The bank made several loans to Mr. Box's business. In August of 2003, Mr. Box liquidated his business to pay off creditors. After this liquidation was complete, FSB was owed an unsecured debt of approximately $107,000.[2] Due in part to the unavailability of assets to satisfy the probable deficiency, and dissatisfied with the possibility of having to write-off or write-down the loan, FSB approached Mr. Box about obtaining a home equity loan to secure the debt. While Mr. Box initially was hesitant to borrow against his

---

[1] To the extent any findings are conclusions, they should be considered conclusions; to the extent any conclusions are findings, they should be considered findings.

[2] Conflicting testimony was offered regarding the Debtors' non-exempt assets and other collateral securing the loans. This evidence principally concerned whether FSB could recover from the Debtors' non-exempt assets if it chose to sue on the debt. Regardless of the measure, the Court finds that even if FSB executed against the Debtors' non-exempt assets, a substantial portion of the pre-existing debt would remain unpaid. Based on this finding, and because FSB has not sought to lift the stay as to this alleged collateral, the Court makes no findings regarding the nature or extent of the bank's interest in any other property. For the balance of this opinion, the Court treats the deficiency as unsecured.

1

homestead, he eventually agreed to take out a home equity loan. Mr. Box testified that this decision was based in part to pay his obligations to the bank, and in part to maintain his standing in the community.

The Debtors executed a series of documents for the home equity loan. These documents contain recitals and affirmations which state that the Debtors were not required to use the proceeds of the loan to repay another debt to the same lender. Despite the fact that Mr. Box admits that he and his wife signed these documents, he claims that they had not in fact read them. The Court does not find this evidence credible. Instead, the Court finds that the Debtors knowingly made the recitals and affirmations.

Nevertheless, the Court finds that the unambiguous intent of the parties was for the home equity loan to collateralize the antecedent debt to FSB.[3] Further, based on the totality of the testimony and the credibility of the witnesses, the Court finds that the bank would not have extended the home equity loan unless the proceeds of the loan were applied to the Debtors' pre-existing debt to FSB. The Court finds that the Debtors were required to apply the proceeds of the loan to the antecedent debt as a condition of the extension of credit. Further, the Court finds that the Debtors' recitals were made despite the fact that both FSB and the Debtors understood that they were not accurate.

After signing the credit application on September 16, 2003, the Debtors proceeded to close on a home equity loan with FSB. On October 30, 2003, however, the Debtors rescinded this loan because the interest rate was incorrect. Then, on November 13, 2003, the Debtors closed for a second time. According to the closing statement, the Debtors did not receive any

---

[3] In the credit application, the Debtors stated that the purpose of the loan was for "debt". Despite this broad categorization, both FSB and Mr. Box testified that they understood that the "debt" referenced in the application was solely debt to FSB.

2

funds. Instead, the proceeds of the Box's home equity loan were applied to the Box's pre-existing debt to FSB. The effect of the transaction was to partially collateralize the previously unsecured debt.

## Conclusions of Law

FSB claims that its interest in the Debtors' homestead is not adequately protected and requests that the stay be lifted under 11 U.S.C. § 362(d)(1). In defense, the Debtors challenge whether FSB possesses a valid lien under the Texas Constitution. To establish a *prima facie* case for cause due to a lack of adequate protection, a movant must initially demonstrate that it holds a claim, secured by a valid, perfected lien upon estate property, and that a decline in the value of its collateral is either occurring or is threatened. *See In re Kowalsky*, 235 B.R. 590, 594-95 (Bankr. E.D. Tex. 1999).

FSB's alleged lien arises under state law. Accordingly, the Court refers to state law to determine the lien's validity. Under the Texas Constitution, a homestead is generally protected from forced sale for the payment of debts. TEX. CONST. art. XVI, § 50(a) (amended 2003). Despite this general prohibition, the Constitution carves out eight categories of debt for which the homestead is liable. *Id*. at § 50(a)(1)-(8). In the matter before the Court, FSB claims that § 50(a)(6) validates its lien by making the homestead liable for certain home equity loans and liens. *Id*. at § 50(a)(6) (amended 2003). That section defines a home equity loan by the requirements that are imposed upon the lender in making the loan. *See In re Adams*, 307 B.R. 549, 553 (Bankr. N.D. Tex. 2004). Under § 50(a)(6), a loan must comply with 15 separate sub-sections of the Texas Constitution. TEX. CONST. art. XVI, § 50(a)(6)(A)-(Q). Accordingly, if any of the requirements are not met, the lien against the homestead is not valid, and the loan is

3

treated as an unsecured extension of credit. *Adams*, 307 B.R. at 553 (citing *Doody v. Ameriquest*, 49 S.W.3d 342, 345-46 (Tex. 2001)).

The only requirement contested in this matter is whether FSB's extension of credit complied with § 50(a)(6)(Q)(i).  Section 50(a)(6)(Q)(i) states:

> The homestead…shall be, and is hereby protected from the forced sale, for the payment of all debts except for…an extension of credit that…is made on condition that…the owner of the homestead is not required to apply the proceeds of the extension of credit to repay another debt except debt secured by the homestead or debt to another lender.

TEX. CONST. art. XVI, § 50(a)(6)(Q)(i) (amended 2003).  Put simply, § 50(a)(6)(Q)(i) prohibits the lender from *requiring* the owner of the homestead to apply the loan proceeds to pay another debt to the same lender. *Id*.

In determining whether FSB complied with this section, FSB argues that the Court's analysis must begin and end with whether the loan was voluntary.  The Debtors argue that the loan was involuntary because of the Debtors' past relationship with the bank and their standing in the community.  The Court cannot discern whether the Debtors are attempting to argue that the contract was the product of undue influence, unconscionability, or coercion.  Regardless of label, the Court finds that the contract was a voluntary arms-length transaction.  Accordingly, the Court concludes that the contract was voluntary, and—as discussed below—qualifies under the requirement listed in § 50(a)(6)(A).  Despite this conclusion, the Court's analysis is not complete.  Rather, the issue is whether the loan qualifies under § 50(a)(6)(Q)(i).

FSB argues that, because the loan was voluntary, it was impossible to *require* the Debtors to do anything.  While FSB's argument has superficial appeal, it disregards the language of § 50(a)(6)(A).  This section states, "[t]he homestead … is hereby protected from forced sale, for the payment of all debts except for … an extension of credit that is secured by a *voluntary lien*

4

on the homestead ….." Thus, to read § 50(a)(6)(Q)(i)'s "required" to mean "voluntary" would make it redundant with § 50(a)(6)(A)'s "voluntary lien" language. The Court will not read constitutional language "to be pointless if it is reasonably susceptible of another construction." *See City of LaPorte v. Barfield*, 898 S.W.2d 288, 292 (Tex. 1995) (citations omitted). Accordingly, the Court must determine the meaning of "require" as used in the Texas Constitution.

When interpreting the Texas Constitution, courts rely heavily on the literal text and must give effect to its plain language. *Cash America Int'l Inc. v. Bennett*, 35 S.W.3d 12, 16 (Tex. 2000) (holding a statute's plain meaning should be conclusive except in the rare cases in which the literal application of the statute will produce a result demonstrably at odds with the intentions of its drafters); *Sorokolit v. Rhodes*, 889 S.W.2d 239, 241 (Tex. 1994) (where language in a statute is unambiguous, courts seek the intent as found in the plain and common meaning of the words and terms used); *Fleming Foods of Texas, Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999); *Republican Party of Tex. v. Dietz*, 940 S.W.2d 86, 89 (Tex. 1997); *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 148 (Tex. 1995); *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 394 (Tex. 1989); *see also United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 (1989). In doing so, however, the Court must give constitutional provisions the effect their makers and adopters intended. *See City of El Paso v. El Paso Community College Dist.*, 729 S.W.2d 296, 298 (Tex. 1987) (citing *Farrar v. Board of Trustees of Employees Retirement Sys. of Tex.*, 243 S.W.2d 688, 692 (Tex. 1951)).

The Court has not found any reported case interpreting "require" as used in § 50(a)(6)(Q)(i). Accordingly, the Court begins its interpretation with the plain language of the Texas Constitution. *See Cash America*, 35 S.W.3d at 16. Webster's Dictionary defines

5

"require" as "to demand as necessary or essential" and "to impose a compulsion or demand on." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1002 (9th ed. 1991).  This definition comports with the Court's understanding of the everyday usage of the word.  The Court concludes that the word "require" in § 50(a)(6)(Q)(i) means that the lender may not demand that the proceeds of the extension of credit be used to pay-off another debt to the same lending institution as a condition of making the extension of credit.  As set forth above, FSB would not have made the loan unless the proceeds were applied to its pre-existing debt.

Although the Debtors were required to apply the proceeds to the Debtors' pre-existing debt, the Court has also found that the Debtors signed various documents stating that they were not in fact required to apply the proceeds of the loan to any debt held by the bank.  The Debtors made this acknowledgement despite the fact that both FSB and the Debtors understood that the Debtors were required to apply the funds to the pre-existing debt.  Accordingly, the issue before the Court is whether mendacious recitals and affirmations may validate a constitutionally prohibited lien.  The Court finds that they may not.

It is fundamental to Texas homestead law that an owner may not change the status of a homestead through false recitals or declarations.  *See In re Skinner*, 74 B.R. 571, 573 (Bankr. N.D. Tex. 1987).  In *Skinner*, the debtors designated 10 of their 91 acres of land as their homestead and then used the non-designated property as collateral for a loan to the debtors' business.  *Id*. at 572.  After filing bankruptcy, however, the lender and the trustee objected to the debtors' attempt to claim the entire 91 acres as exempt, and requested that the Court enforce the debtors' prior designation.  *Id*.  In finding that the debtors were allowed to claim the exemption the Court stated:

> If property be homestead in fact and law, lenders must understand that liens cannot be fixed upon it, and that declarations of husband and wife to the contrary,

6

> however made, must not be relied upon. They must further understand that no designation of homestead contrary to the fact will enable parties to evade the law and encumber homesteads with liens forbidden by the [Texas] Constitution.

*Id*. (citing *In re Niland*, 809 F.2d 272, 276 (5th Cir. 1987) (quoting *Texas Land & Loan Co. v. Blalock*, 13 S.W. 12, 13 (Tex. 1890)). As found by the Fifth Circuit in *Niland*:

> This rule applies even if, as in the case *sub judice*, the homestead claimant has executed, acknowledged, and filed in the deed records an instrument designating a contrary homestead. One rationale for this somewhat paternalistic rule is a perception that to permit an estoppel to arise on the basis of a sworn declaration by a person living on property that the property was not his homestead would result in the routine execution of such affidavits by persons owning homesteads in order to obtain loans secured by homestead property for impermissible purposes, thereby rendering the constitutional homestead protection nugatory. This rule is also based on a recognition that many in financial difficulties will sign anything to obtain money from lenders, and that if not put to a duty of inquiry, many lenders will simply have the borrower execute a form affidavit stating that the property is not claimed as homestead. It is interesting to note that this is exactly what happened in this case.

*In re Niland*, 809 F.2d at 272 (citations omitted).

These decisions control the present matter. Like *Skinner*, the Debtors and FSB attempted to impose a lien in violation of the protections set out under the Texas Constitution. Specifically, they intended to enter into a contract that required the Debtors to apply the proceeds of a home equity loan to a debt with the same lender. This action violates § 50(a)(6)(Q)(i). Accordingly, the Court concludes that the lien does not meet the requirements set out under the Texas Constitution, and therefore results only in an unsecured extension of credit. *See Doody*, 49 S.W.3d at 345-46.

FSB contends that, if it violated the Constitution, such a violation is excused pursuant to TEX. CONST. art. XVI, § 50(u). This section states:

> The legislature may by statute delegate one or more state agencies the power to interpret Subsections (a)(5)-(a)(7), (e)-(p), and (t), of this section. An act or omission does not violate a provision included in those subsections if the act or omission conforms to an interpretation of the provision that is: (1) in effect at the

time of the act or omission; and (2) made by a state agency to which the power of interpretation is delegated as provided by this subsection or by an appellate court of this state or the United States.

Consistent with the Constitution, the Texas legislature revised Chapter 11 of the Texas Finance Code to allow the Texas Finance Commission to issue interpretations of the home equity constitutional provisions applicable to all lenders authorized to make such loans. *See* TEX. FIN. CODE. ANN. § 11.308 (Vernon 2004). The Finance Commission has promulgated various interpretive regulations of § 50. Specifically, the Finance Commission offers the following interpretation of § 50(a)(6)(Q)(i):

> An equity loan must be made on the condition that the owner of the homestead is not required to apply the proceeds of the extension of credit to repay another debt except debt secured by the homestead or debt to another lender.
>
> (1) An owner may use the proceeds of an equity loan for any purpose. An owner is not precluded from voluntarily paying off a debt that is owed to the same lender.
>
> (2) The lender may not require an owner to repay a debt owed to the lender, unless it is a debt secured by the homestead. The lender may require debt secured by the homestead or debt to another lender or creditor be paid out of the proceeds of an equity loan. The lender may not otherwise specify or restrict the use of the proceeds.
>
> (3) When an owner applies for a debt consolidation loan, it is the owner, not the lender that is requiring that proceeds of a home equity loan be applied to another debt. If the proceeds of a home equity loan are used in conformity with the owner's credit application, the limitations of this section do not apply.

7 TEX. ADMIN. CODE § 153.18(1)-(3) (2004).

However, the Texas Finance Commission's interpretations did not become effective until January 8, 2004. Because the Box's loan closed on November 16, 2003, the interpretations do not apply.[4] Even if the interpretations had been effective, the Court finds that FSB's conduct would not be sanctioned. The only section of the interpretations that arguably provides a safe

---

[4] By its terms, § 50 of the Texas Constitution applies the Texas Finance Commission's interpretations only to transactions done *after* the effective date of the interpretations. TEX. CONST. art. XVI, § 50(u) (amended 2003).

harbor is § 158.18(3).  By its own terms, § 158.18(3) only applies to debt consolidation loans. Inasmuch as the term "debt consolidation loan" is not defined in the Texas Constitution or elsewhere in Texas law, the Court will give the term its plain meaning.  *Ron Pair*, 489 U.S. at 242; *Cash America*, 35 S.W.3d at 16; *Sorokolit*, 889 S.W.2d at 241.  Black's Law Dictionary defines consolidation as "to combine or unify" and Webster's Dictionary further defines it as "to join together into one whole."  BLACK'S LAW DICTIONARY 303 (7th ed. 1999); WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 281 (9th ed. 1991).  Rather than consolidating a loan, FSB divided the Debtors' antecedent loan between a secured and unsecured obligation.  Such a result is the antithesis of consolidation.[5]

Accordingly, the Court denies FSB's Motion to Lift Stay because it has no valid lien to protect.

Signed at Houston, Texas on May 3, 2005.

MARVIN ISGUR
United States Bankruptcy Judge

---

[5] FSB would have the Court hold that a lender may require the application of the proceeds of a new loan to a pre-existing loan to the same lender whenever the borrower completes a loan application that so provides.  This interpretation assumes that the Texas Finance Commission has rewritten the Constitution rather than interpreted it. A more consistent interpretation would have subsection (3) apply to the repayment of a loan to a third-party lender. If the Court attributed the meaning suggested by FSB, it would mean that the Finance Commission had ignored the Constitution and rendered § 50(a)(Q)(i) to be meaningless.  Not only does the Court decline to give such interpretation to the acts of the Finance Commission, any such meaning would exceed the "interpretive" authority authorized by the Texas Constitution.